## SLEE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 237, October Term, 1929.

Circuit Court of Appeals, Second Circuit.
June 16, 1930.

Newell W. Ellison, of Washington, D. C., and J. Harry Covington and Wm. Merrick Parker, both of Washington, D. C. (Coving-ton, Burling & Rublee, of Washington, D. C., of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and J. Louis Monarch and Norman D. Keller, Sp. Asst. Attys. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Joe S. Franklin, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for commissioner.

Before L. HAND, CHASE, and MACK, Circuit Judges.

L. HAND, Circuit Judge.

During each of the years in question Slee, the petitioner, made gifts to the American Birth Control League, which he deducted from his income. The Commissioner, and later the Board, disallowed these, and the only question is whether section 214 (a) (11) (B) of the Internal Revenue Act of 1921 (42 Stat. 227), and section 214 (a) (10) of the Revenue Acts of 1924 and 1926 (26 USCA § 955 (a) (10), include the League. Those sections allow the deduction of gifts made to "any corporation * * * organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, including posts of the American Legion or * * * for the prevention of cruelty to children or animals." The question is whether the League is organized for charitable, scientific or educational purposes, and, if so, whether those are its exclusive purposes.

It at first was an unincorporated association, but secured incorporation in New York in September, 1922, and its declared objects were as follows: "To collect, correlate, distribute and disseminate lawful information regarding the political, social and economic facts of uncontrolled procreation. To enlist the support and co-operation of legal advisors, statesmen and legislators in effecting the lawful repeal and amendment of state and federal statutes which deal with the prevention of conception." To publish a magazine "in which shall be contained reports and studies of the relationship of controlled and uncontrolled procreation to national and world problems." In operation it has gone somewhat further than these projects. It maintains a "research department" in New York in charge of a physician, a medical, and a clinical, director. Large numbers of married women come to the clinic for advice, are examined, and if in the judgment of the physician their health demands but not otherwise, are told how to prevent conception. Unmarried women are not received. The officials keep elaborate records of the work, fol-

low up the cases, and publish the results at large to the medical profession. At times patients are charged for the service, but the work as a whole goes on at a loss and has to be supported by gifts. The only part of its activities which can be thought to touch upon legislation is in directing persons how best to prepare proposals for changes in the law, and in distributing leaflets to legislators and others recommending such changes, chiefly by bringing before them such information as is supposed to "enlighten" their minds. These suggest and advocate a relaxation in existing restraints.

That the League is organized for charitable purposes seems to us clear, and the Board did not find otherwise. A free clinic, or one where only those pay who can, is a part of nearly every hospital, a recognized form of charitable venture. We can see no difference that this is confined to married women who ought not bear children both for their own, and the children's, sake. Health is as much at stake as though it attempted the general prevention of sickness. Nor does it matter that there are many who think the cure worse than the disease; there are people who object to venereal prophylaxis. It is enough that the object was to maintain health without profit by lawful means; that has been a recognized kind of charity from time immemorial. The collection and publication of the information so obtained was also a legitimate scientific enterprise, like any collection of medical data. We cannot discriminate unless we doubt the good faith of the enterprise.

This raises the only question which seems to us important, which is, whether the League is also agitating for the repeal of laws preventing birth control. The Board did not throw any doubt upon the purposes as presented, or intimate that more was meant than met the ear, but it thought that the declaration in the charter of a purpose to "enlist the support * * * of * * * legislators to effect the lawful repeal" of existing laws, and the measures taken to bring this to pass, prevented the League from being "exclusively" charitable. Political agitation as such is outside the statute, however innocent the aim, though it adds nothing to dub it "propaganda," a polemical word used to decry the publicity of the other side. Controversies of that sort must be conducted without public subvention; the Treasury stands aside from them. Nevertheless, there are many charitable, literary and scientific ventures that as an incident to their success require changes in the law. A charity may need a special charter allowing it to receive larger gifts than the

general laws allow. It would be strained to say that for this reason it became less exclusively charitable, though much might have to be done to convince legislators. A society to prevent cruelty to children, or animals, needs the positive support of law to accomplish its ends. It must have power to coerce parents and owners, and it does not lose its character when it seeks to strengthen its arm. A state university is constantly trying to get appropriations from the Legislature; for all that, it seems to us still an exclusively educational institution. No less so if, for instance, in Tennessee it tries to get leave to teach evolutionary biology. We should not think that a society of booklovers or scientists was less "literary" or "scientific," if it took part in agitation to relax the taboos upon works of dubious propriety, or to put scientific instruments upon the free lists. All such activities are mediate to the primary purpose, and would not, we should think, unclass the promotors. The agitation is ancillary to the end in chief, which remains the exclusive purpose of the association. Trinidad v. Sagrada Orden, 263 U. S. 578, 44 S. Ct. 204, 68 L. Ed. 458.

So far as the society at bar sought to relieve itself of the restraints of law in order the better to conduct its charity, we might indeed hold that it fell within the class of which we have just given some instances. So far, however, as its political activities were general, it seems to us, regardless of how much we might be in sympathy with them, that its purposes cannot be said to be "exclusively" charitable, educational or scientific. It may indeed be for the best interests of any community voluntarily to control the procreation of children, but the question before us is whether the statute covers efforts to proselytize in that or other causes. Of the purposes it defines "educational" comes the closest, and when people organize to secure the more general acceptance of beliefs which they think beneficial to the community at large, it is common enough to say that the public must be "educated" to their views. In a sense that is indeed true, but it would be a perversion to stretch the meaning of the statute to such cases; they are indistinguishable from societies to promote or defeat prohibition, to adhere to the League of Nations, to increase the Navy, or any other of the many causes in which ardent persons engage.

We cannot say that the Board was without warrant in concluding that this aspect of the League's work was not confined solely to relieving its hospital work from legal obstacles. Indeed the charter does not mention the

clinic or anything of the sort; it speaks only of the League's scientific projects, its general purpose to secure the repeal of laws which deal with preventing conception, and the publication of the magazine. This is not indeed conclusive; in practice the League might have abandoned all such efforts except as they conduced to a relief of the clinic. The evidence passes somewhat lightly over this feature of the work, for obvious reasons, but it does not disclaim the charter, and, if it did, the Board was not obliged to conclude that the abandonment of what had been so formally declared was final. Indeed, were we in a position to pass upon the evidence de novo, we should be somewhat slow to believe that the ends proposed did not still include convincing Legislatures and other influential persons that it was desirable in the interests of the moral and social well-being of the community that all persons should be free to control the number of their children. However commendable this may be—and we mean to raise no question as to it—it is not in our judgment one of those purposes which Congress meant to assist. Our review is limited to the correction of obvious errors; we cannot say that the Board committed any here.

Decision affirmed.