## VANDERBILT et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3248.

Circuit Court of Appeals, First Circuit.

Dec. 8, 1937.

Hugh C. Bickford, of Washington, D. C. (George Gordon Battle, of New York City, and Paul Haworth, Dante Galotta, and R. Kemp Slaughter, all of Washington, D. C., on the brief), for petitioners for review.

Robert N. Anderson, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for Commissioner of Internal Revenue.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is a petition to review an order or decision of the Board of Tax Appeals sustaining a deficiency assessment against the estate of Alva E. Belmont for the year 1933, in the sum of $31,425.13.

The question raised by the petition is whether, under section 303 (a) (3) of the Revenue Act of 1926, 26 U.S.C.A. § 412 (d) and note, the executors were entitled to deduct from the value of the gross estate,

for purposes of the tax, the sum of $100,000 which Mrs. Belmont bequeathed to the National Woman's Party. The facts found by the Board, based on a stipulation of facts, were in substance as follows:

The petitioners are the executors of the estate of Alva E. Belmont, who died January 26, 1933, leaving a will in which she bequeathed $100,000 to the National Woman's Party in the following language:

"Third. I give and bequeath to National Woman's Party, a corporation organized and existing under and by virtue of the Laws of the District of Columbia, United States of America, the sum of one hundred thousand ($100,000) dollars."

The decedent was a leader in the movement for the establishment of women's rights and the elimination of legal, social, and economic restrictions which placed women in an inferior position. Her support of women's rights caused her to lend encouragement and aid to many movements for the improvement of the state of woman, and she was a leader in the movement which resulted in the adoption of the Nineteenth Amendment to the Constitution. In October, 1900, with others who had worked with her on a national scale to secure its adoption, she became convinced that the franchise alone would not remove the existing legal and economic handicaps since the average woman was ignorant of their existence and effect. A great campaign for the instruction of women in such matters became the ideal of this group and the National Woman's Party was formed to conduct the campaign on a national scale. Mrs. Belmont became chairman of the party and served as such until her death.

The party was incorporated September 19, 1918, under chapter 18, subchapter 3, of the Code of Laws of the District of Columbia, D.C.Code 1929, T. 5, §§ 121–126, which provides:

"Any three or more persons of full age, citizens of the United States, a majority of whom shall be citizens of the District, who desire to associate themselves for benevolent, charitable, educational, literary, musical, scientific, religious, or missionary purposes, including societies formed for mutual improvement or for the promotion of the arts, may make, * * * and file in the office of the recorder of deeds, to be recorded by him, a certificate in writing.
* * *

"Upon filing their certificates the persons who shall have signed and acknowledged the same and their associates and successors shall be a body politic and corporate."

The objects of the party as stated in the certificate of incorporation are as follows:

"The term for which the society is organized is perpetual.

"The particular business and objects of the society are educational and for mutual improvement and especially by the preparation and circulation of books, newspapers, the delivery of speeches, lectures and such other proper means as in the judgment of the society will promote that end, to educate public sentiment to a recognition of the equality of the sexes in all their rights, privileges and obligations."

The constitution and by-laws of the party, as organized and in effect in 1933, article 2, stated the object of the party to be as follows:

"The object of this organization shall be to secure for women complete equality with men under the law and in all human relationships."

Other matters were provided for in the by-laws which it is unnecessary to mention here.

Following the adoption of the Amendment to the Constitution in 1900 and in pursuance of article 2 of its constitution and by-laws, the party took upon itself "to work for the complete freedom of women in all lines." From 1922 to 1934 it "conducted a national campaign for the establishment of woman's rights and the elimination of hardships," it established a paper, which it has since maintained, in which were collected and published all the facts relating to the campaign. Members of the party conducted an exhaustive research and presented bibliographies of all books and literature relating to women's rights. This research included an examination of the statutes of each of the forty-eight states which restricted and handicapped women. They at the same time examined the constitutional provisions of the states and state courts' decisions bearing upon the status of women. The results of these studies were published in pamphlets and circulars for each state. When noteworthy statutes were passed, such as the Wisconsin Equal Rights Law, special pamphlets were issued, such as "What Women Won in Wisconsin." Through the issuance and wide circulation of these pamphlets and circulars and the organizing of compaigns, the party turned

the attention of the country to the equal rights question.

They also organized, as a part of this campaign, several great pageants in different parts of the country to which many thousands of people came. The pageants dramatized the struggle for woman's freedom. A further feature connected with these pageants was the delivery of speeches by leading men and women relating to the cause of the party.

It was further found that the party had drafted many bills for state legislatures designed to equalize the control of children, of property, and of earnings; also bills to make contractual, citizenship, and inheritance rights equal; bills to provide equal opportunities in the schools and universities, in the professions and industries, and in the Government service; and many other like bills.

Facts and information in support of these bills were supplied by the party and one hundred such laws were passed by state legislatures. The party also supplied facts, speakers, and support for the adoption of a joint resolution proposing an amendment to the Constitution of the United States, introduced in both Houses of Congress, reading:

"Men and women shall have equal rights throughout the United States and every place subject to its jurisdiction."

Between March 15, 1922, and December 31, 1934, the party received $1,165,231.40 from dues from its members and from contributions; and on December 31, 1934, it had expended all but $583.60 to defray the cost of its activities, including those relating to the drafting of bills, the furnishing facts and information in support of them, and advocating their adoption.

It was also found that the corporation was not organized for profit and no part of its earnings inured to the benefit of any shareholder or individual.

In the estate tax return filed by the executors a deduction from the gross estate was claimed on account of the $100,000 bequeathed to the National Woman's Party. The Commissioner denied the deduction and assessed a deficiency tax accordingly. The Board of Tax Appeals affirmed the Commissioner's determination. The Board held that, on the facts found, the National Woman's Party was not organized and operated exclusively for educational purposes and, therefore, the executors were not entitled to have the $100,000 deducted from the gross estate for purposes of the estate tax.

In Section 303 (a) (3) it is provided that in assessing an estate tax the value of the net estate shall be determined by deducting from the value of the gross estate the amount of all bequests "to or for the use * * * of any corporation organized and operated exclusively for * * * charitable * * * or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private stockholder or individual."

The object for which a corporation is organized is to be determined from what is stated in its certificate of incorporation and its constitution and by-laws. If only the certificate of incorporation was to be considered in determining the object of the party here in question, it would seem fairly clear that it was educational, but when its certificate is considered in connection with the provisions of its constitution and by-laws, above quoted, its object is not restricted to educational activities but extends to the employment of such means as it sees fit, political or otherwise, "to secure for women complete equality with men under the law and in all human relationships."

But if it be assumed that the sole object for which the party was organized was educational, the facts found by the Board show that the corporation was not operated exclusively for educational purposes. The procuring of the enactment and repeal of laws through the drafting of bills, their advocacy, the furnishing of facts and information in their support, and the payment of the cost of carrying on such activities are not educational but political. See Massachusetts v. Mellon, 262 U.S. 447, at page 482, 483, 43 S.Ct. 597, 67 L.Ed. 1078; Davis v. Boston & Maine Railroad Co., 1 Cir., 89 F.2d 368, 392. In Slee v. Commissioner of Internal Revenue, 2 Cir., 42 F.2d 184, 185, 72 A.L.R. 400, the court, in passing on a like question, said: "Political agitation as such is outside the statute. * * So far, however, as its [the corporation's] political activities were general, it seems to us, regardless of how much we might be in sympathy with them, that its purposes cannot be said to be 'exclusively' charitable, educational or scientific."

It appears that the Woman's Party, on at least one hundred occasions, was successful in obtaining legislation that it had sought through the various activities which the Board found it employed, to say nothing

of the occasions where it employed like activities but without success. We fail to see how the Board could have reached any other conclusion than that the bequest should be included in the gross estate.

The order or decision of the Board of Tax Appeals is affirmed.