## GIRARD TRUST CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7500.

Circuit Court of Appeals, Third Circuit.

June 27, 1941.

CLARK, Circuit Judge, dissenting.

Shippen Lewis, of Philadelphia, Pa., and E. F. Colladay, of Washington, D. C., D. C. Colladay and Wilton H. Wallace, both of Washington, D. C. (Colladay, McGarraghy, Colladay & Wallace, of Washington, D. C., of counsel), for petitioners.

Joseph M. Jones, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This case, as it comes to us presents one problem. That problem is the correctness of the conclusion of the Board of Tax Appeals which disallowed a deduction from the estate tax of a bequest by a testatrix to the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church. The testatrix, Ida Simpson, died in 1933. The statute applicable is the Reve-

nue Act of 1926, c. 27, 44 Stat. 9, § 303(a)(3), 26 U.S.C.A. Int.Rev.Acts, page 234, which authorizes the deduction from the value of the gross estate of "The amount of all bequests * * * to * * * any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * *."[1]

The beneficiary in question was incorporated in 1917 in the District of Columbia under the statute dealing with "benevolent, charitable, educational, * * * religious, or missionary" societies. D.C.Code 1929, T. 5, § 121 et seq. The objects stated in the certificate of incorporation are: "To promote the cause of temperance by every legitimate means; to prevent the improper use of drugs and narcotics; to render aid to such causes as in the judgment of the board of trustees, tend to advance the public welfare." While the Commissioner suggests significance in the fact that the Board of Temperance is separately organized, any possible significance disappears when it is seen (as is shown) that its relation to the General Conference of the Church is the same as that of such bodies as its Board of Foreign Missions and Board of Home Missions.

In determining whether the bequest to the Board of Temperance qualifies for deduction the Board's relationship to the Methodist Episcopal Church is relevant. So, also, is the position of the governing body of the Church with regard to both the use and sale of intoxicating liquor. It appears that the General Conference is the sole law making body of the Church and each of its Boards and also constitutes its Supreme Court. The first General Conference of the Methodist Church was held in 1784. In the first General Rules there are statements dealing with and condemning the liquor traffic. This attitude has remained unchanged. The General Rules state the expectation that those subject to the discipline of the Church shall continue to evidence their desire of salvation by avoiding evil, such as "drunkenness, buying or selling spirituous liquors or drinking them, unless in cases of extreme necessity". Paragraph 74 of the Discipline declares the Church's policy: "We therefore regard voluntary total abstinence from all intoxicants as the obligation of the citizen and the complete legal prohibition of the traffic in alcoholic drinks as the duty of civil government." The Board of Temperance has never adopted any by-laws and operates under the Articles of Discipline of the General Conference.[2]

We do not understand that either the Commissioner or our dissenting brother would question the application of the deduction here if the purpose of the activity of the Board of Temperance stopped short of any possible attempt to influence or otherwise affect legislation. Reference to the law of charitable trusts we believe in point, as does the dissent, although counsel for neither side has pressed the analogy. It is clear that a trust for the advancement of religion is charitable. Scott on Trusts, § 371.[3] It is clear, too, from the facts of this

[1] The Act was amended in 1934, 26 U.S.C.A. Int.Rev.Acts, page 235, by the addition of the phrase "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation".

Treasury Regulations 80, promulgated under the Act of 1926 so amended provided:

"Art. 45. Religious, charitable, scientific, and educational corporations.—A corporation or association to which such a transfer was made must meet four tests: (1) It must be organized and operated for one or more of the specified purposes; (2) it must be organized and operated exclusively for such purpose or purposes; (3) no part of its net earnings shall inure to the benefit of private stockholders or individuals; and (4) no substantial part of its activities shall be carrying on propaganda, or otherwise attempting, to influence legislation."

[2] Article 478 of the Discipline of 1932, under which the Board was operating at the time of the death of the decedent in this case provides:

"Section 2. Article 1. The object of this Board is to promote voluntary total abstinence from all intoxicants and narcotics, to promote observance and enforcement of all existing constitutional provisions and statutory enactments that suppress the liquor traffic and the traffic in narcotic drugs, to promote the speedy enactment of such legislation throughout the world, and to defend and maintain established civil and religious liberties."

[3] Mr. Scott points out:

"It is true that the Statute of Charitable Uses made no mention of this purpose in its enumeration of charitable purposes, the only reference to religion in any form being 'repair of bridges, forts, havens, causeways, churches, seabanks and highways.' Indeed, Sir Francis Moore, the draftsman of the act, explained that religious purposes were omitted intentionally 'lest the gifts intended

110

case that the Methodist Episcopal Church has, since its organization in 1784, regarded personal practices of its members with regard to the use of intoxicating liquors as an inherent part of its religious practices. It is not the business of the court either to approve or disapprove of such inclusion or exclusion so long as no violation of secular law is involved. The law is well settled, also, that while a charitable trust cannot be created for a purpose which is illegal, Scott on Trusts, § 377, the object of the trust does not have to be the advancement of a majority view. It must not, of course call for violation of the law nor must it be "irrational". It is only when the court is convinced that the purpose of the trust can serve no rational object that the court will declare it invalid. Restatement, Trusts, § 374; Scott on Trusts, § 370.4. Indeed, aside from the added point of the prohibition of the use of intoxicants as a religious practice, numerous cases have upheld, as a charitable trust, one for the promotion of temperance in the use of intoxicating liquors.[4] Directly upon the point, a contribution to the World League Against Alcoholism was held deductible from gross income under a clause in the Revenue Act of 1928 similar to that here in question. Cochran v. Commissioner of Internal Revenue, 4 Cir., 1935, 78 F.2d 176.

The difficult part of this case comes with regard to that part of the activity of the Board of Temperance which has to do with the attempt to influence legislation. A bright line between that which brings conviction to one person and its influence on the body politic cannot be drawn. Mr. Justice Holmes forcefully puts it: "If you * * * want a certain result with all your heart you naturally express your wishes in law and sweep away all opposition".[5] Religion includes a way of life as well as beliefs upon the nature of the world and the admonitions to be "Doers of the word and not hearers only" (James 1:22) and "Go ye therefore, and teach all nations, * * *" (Matthew 28:19) are as old as

the Christian Church. The step from acceptance by the believer to his seeking to influence others in the same direction is a perfectly natural one, and it is found in countless religious groups. The next step, equally natural, is to secure the sanction of organized society for or against certain outward practices thought to be essential. Thus we had Sunday observance laws long before prohibition of alcohol became an important issue. The advocacy of such regulation before party committees and legislative bodies is a part of the achievement of the desired result in a democracy. The safeguards against its undue extension lie in counter-pressures by groups who think differently and the constitutional protection, applied by courts, to check that which interferes with freedom of religion for any.

Nor has the law sought to draw such a bright line between the exercise of private and public influence. Judge Hand has pointed out[6] that the promoters of a charity are not unclassed when the charity seeks a special charter or when a society to prevent cruelty to children seeks positive support of law to accomplish its ends or when a university seeks legislation to provide its appropriations. Surely a church would not lose its exemption as a religious institution if, pending a proposal to repeal Sunday observance laws, the congregation held a meeting on church property and authorized a committee to appear before a legislative body to protest against the repeal. The majority of the charitable trust cases recognize the validity of a gift to prohibit or minimize manufacture and sale of intoxicating liquor.[7] They are not directly controlling, of course. But they furnish a strong analogy. The activities of the Board fell within the type which have been regarded as religious by the Methodist Church for a century and a half. A limitation, if any, upon the deduction granted in general terms of bequests to religious bodies is for Congress to make and Congress has since made it in the 1934 statute. Such limitation not having been imposed by legislation, it

to be employed upon purposes grounded upon charity, might, in change of times (contrary to the minds of the givers) be confiscate into the King's treasury. For religion being variable, according to the pleasure of succeeding princes, that which at one time is held for orthodox, may at another, be accounted superstitious, and then such lands are confiscate.' "

[4] Scott on Trusts § 374.1 and authorities cited.

[5] From his dissenting opinion in Abrams v. United States, 1919, 250 U.S. 616, 40 S.Ct. 17, 22, 63 L.Ed. 1173.

[6] Slee v. Commissioner of Internal Revenue, 2 Cir., 1930, 42 F.2d 184, 72 A.L.R. 400. This case which involved a gift to the American Birth Control League had no connection with a religious purpose.

[7] See collections of authorities in Scott on Trusts § 374.1, 73 A.L.R. 1361.

is *not for a court or administrative officer to impose it.*

The decision of the Board of Tax Appeals is reversed.

CLARK, Circuit Judge (dissenting).

I think my learned brethren buttress their view unnecessarily. This seems to me a pity since I happen to believe that the especial buttress selected, however beautiful in outward form, is internally unsound. As I understand them, they say that the trust of the case at bar is religious because religion includes what particular people think to be an ethical way of life. That seems to me to be confusing the sanctions with the things sanctified. But whatever it may seem to me is not important because this is what it has seemed to the United States Supreme Court. Mr. Justice Field said:

"The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637.[1]

As I began by saying, this appears supererogation. I am quite willing to concede a trust is as much within the word "religious" as is the word "charitable" of the statute. My difference with my distinguished colleagues is, as I think, more fundamental. These statutes employ language[2] that has a background in legal history; generous giving is encouraged by both enforcement and exemption. An examination of that background reveals inter alia the identical disagreement involved here.[3] For that reason, I believe the analogy exact[4] and am correspondingly surprised at its omission from the opinions of the United States Courts[5] and, because of that perhaps, of the parties to this litigation.

Any extended discussion of the Statute of Elizabeth and the incorporation of the theory of its preamble[6] in English and American law would be pedantic.[7] The problem is its augmentation by analogy.[8] It is plain that any emanation from Elizabethan days cannot be currently conclusive.[9]

---

[1] Cf. Hopkins, The History of Religions, p. 2; Frazer, The Golden Bough, 3rd Ed., i. 222.

[2] The Federal estates tax allows a deduction for bequests "to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes", Int.Rev.Code, § 812(d), 26 U.S.C.A. Int. Rev.Code, § 812(d); § 303(a) (3) of the Revenue Act of 1926, 26 U.S.C.A. Int. Rev.Acts, page 234; § 403(a) (3) of the Revenue Acts of 1921 and 1918, 42 Stat. 279, 40 Stat. 1098.

[3] This I understand to be conceded by the majority.

[4] Charitable Trusts—Trust—Purpose— Political Agitation and Repeal of Existing Laws, 4 Southern California Law Review 418 (note).

[5] Slee v. Commissioner, 2 Cir., 42 F.2d 184, 72 A.L.R. 400*; Leubuscher v. Commissioner, 2 Cir., 54 F.2d 998; Vanderbilt v. Commissioner, 1 Cir., 93 F.2d 360; Montgomery v. United States, 63 Ct.Cl. 588; Old Colony Trust Co. v. Welch, D. C., 25 F.Supp. 45; cf. Weyl v. Commissioner, 2 Cir., 48 F.2d 811; Gimbel v. Commissioner, 3 Cir., 54 F.2d 780; In re Moore's Estate, 66 Misc. 116, 122 N. Y.S. 828; Paul and Mertens, Federal Income Taxation, §§ 29.20 through 29.32.

* This case is discussed by Professor Scott in 3 Scott on Trusts in his chapter on Charitable Trusts, § 374.4 headed Changes in existing law.

[6] " * * * some for relief of aged, impotent and poor people; some for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars in universities; some for repair of bridges, ports, havens, causeways, churches, sea-banks and highways; some for education and preferment of orphans, some for or towards relief, stock or maintenance for houses of correction, some for marriages of poor maids, some for supportation, aid and help of young tradesmen, handicraftsmen and persons decayed, and others for relief or redemption of prisoners or captives, and for aid or ease of any poor inhabitants concerning payments of fifteens, setting out of soldiers and other taxes." Stat. 43 Eliz., c. 4 (1601).

[7] 4 Halsbury's Laws of England, 2d Ed., Charities, p. 107; 3 Scott on Trusts § 348.2, History of charitable trusts in England, § 348.3, Charitable Trusts in the United States; Zollmann, American Law of Charities, Chapter I, Statute of Elizabeth, Chapter II, American Development.

[8] 4 Halsbury's Laws of England, above cited, p. 122; 3 Scott on Trusts, above cited, § 368.1, The Statute of Charitable Uses; Zollmann, American Law of Charities, above cited, Chapter IV, What Is A Charity, §§ 191, 192, 193.

[9] 2 Restatement of Trusts, Chapter II, Charitable Trusts, Topic 3, § 368b, The nature of charitable purposes; 3 Scott on Trusts, above cited, § 368, What purposes are charitable.

The exact scope of any addition, however, is not so plain. The courts have been liberal. They have, in fact, found a "charitable" purpose to be synonymous with whatever is of social interest and benefit to the community.[10] As that changes with the community, with the century, and maybe with the "Chancellor's foot", there has not been complete uniformity of decision. Professors Zollmann and Scott and the authors of the Restatement of Trusts have furnished detailed enumerations.[11] The concern here is with that type of charitable purpose which is described by Lord Halsbury as "the promulgation of particular doctrines or principles"[12] and by Professor Scott as "the dissemination of beliefs or doctrines".[13]

The deduction is claimed on a bequest in the will of the pious daughter of a pious father. The denominational cloak of that piety was the Methodist Church in whose flock the father had been a leading bishop. No doubt wishing to hand on his torch, the testatrix willed a considerable sum to the Board of Temperance, Prohibition, and Public Morals of the Methodist Church. This Board was authorized in 1908 by the lawmaking body of the Methodist Episcopal Church. Thereafter, and in 1917, it was incorporated under a Certificate which read:

"To promote the cause of temperance by every legitimate means; to prevent the improper use of drugs and narcotics; to render aid to such causes as in the judgment of the board of trustees, tend to advance the public welfare." Certificate of Incorporation, Para. 3.

And at the pertinent date, 1932, it was operating under a Constitution, Article 1 of which stated:

"The *object* of this Board is to promote voluntary total abstinence from all intoxicants and narcotics, to promote observance and enforcement of all constitutional provisions and statutory enactments that suppress the liquor traffic and the traffic in narcotic drugs, *to promote the speedy enactment of such legislation* throughout the world." Section 2 (italics ours).

The last phrase of the Board of Temperance's Constitution is so explicit that one need not examine its fully corroborating activities nor be troubled by any niceties of dominant and servient purpose.[14]

The choice, therefore, is between two conflicting lines of authorities. It is agreed that the wisdom or popularity[15] of the particular cause for which the money is given is not for the courts. So, even causes that are in such irreconcilable conflict as antivivisection and medical research by experimentation upon living animals; and the promotion of peace by disarmament and by preparedness for war, have been approved.[16] Indeed, in the very field of the principal case there has been disagreement. Whatever has been said in favor of temperance, many decry the virtue of total abstinence. Counsel's quotation of the proverb, "Wine is a mocker, strong drink is raging"[17] might be answered by a reference to Plato's Dialogues.

ΑΘ. Καὶ δὴ καί τόν οἶνόν γε, ὡς ἔοικεν, ὃ τῶν ἄλλων λόγος ἵνα μανῶμεν φησὶν ἐπὶ τιμωρίᾳ τῶν ἀνθρώπων δεδόσθαι. ὃ δέ νῦν λεγόμενος ὑφ' ἡμων φάρμακον ἐπὶ τοὐναντίον φησὶν αἰδοῦς μέν ψυχῆς κτήσεως ἕνεκα δεδόσθαι, σώματος δέ ὑγείας τε καί ἰσχύος.

---

10 2 Restatement of Trusts, above cited, § 374f, Community purposes; 3 Scott on Trusts, above cited, § 368, What purposes are charitable.

11 Zollmann, American Law of Charities, above cited, Chapter V, Religion, Chapter VI, Benevolence, Chapter VII, Education, Chapter VIII, Municipal Purposes; 3 Scott on Trusts, above cited, § 369 et seq. Relief of poverty; § 370 et seq. Advancement of education; § 371 et seq. Advancement of religion; § 372 et seq. Promotion of health; § 373 et seq. Governmental or municipal purposes; § 374 et seq. Promotion of other purposes beneficial to the community; 2 Restatement of Trusts, above cited, Topic 3, § 368, What Purposes Are Charitable; § 369, Relief of Poverty; § 370, Advancement of Education; § 371, Advancement of Religion; § 372, Promotion of Health; §

373, Governmental or Municipal Purpose; § 374, Promotion of Other Purposes Beneficial to the Community.

12 4 Halsbury's Laws of England, above cited, p. 125.

13 3 Scott on Trusts, above cited, § 370.4.

14 Lord Hanworth in Re Hood, (1931) 1 Ch. 240.

15 3 Scott, on Trusts, above cited, § 374.7; 2 Restatement of Trusts, above cited, § 374L.

16 2 Restatement of Trusts, above cited, § 374L; compare Re Foveaux, Cross v. London Anti-Vivisection Society, (1895) 2 Ch. 501, with Re Hummeltenberg, Beatty v. London Spiritualistic Alliance, (1923) 1 Ch. 237, approved in Re Grove-Grady, Plowden v. Lawrence, (1929) 1 Ch. 557.

17 Old Testament, Proverbs, xx. 1.

Original: Plato, Laws, Book II, p. 672 (1 Bury, Plato, Laws, p. 156).[18]

By the English view, a trust is not charitable if the attainment of its purpose involves a change in existing law.[19] The best known judicial expression thereof is by Lord Parker. The learned law Lord said:

"The abolition of religious tests, the disestablishment of the church, the secularization of education, the alteration of the law touching religion or marriage, or the observation of the sabbath, are purely political objects. Equity has always refused to recognize such objects as charitable * * * a trust for the attainment of political objects has always been held invalid, not because it is illegal, for everyone is at liberty to advocate or promote by any lawful means a change in the law, but because the court has no means of judging whether a proposed change in the law will or will not be for the public benefit, and therefore cannot say that a gift to secure the change is a charitable gift." Bowman v. Secular Society Limited, [1917] Appeal Cases 406, 442.

In the discussion of a trust factually akin to the case at bar, the doctrine has received exposition:

"The position of a trust dealing with the promotion of temperance was first considered by the court in The Commissioners of Inland Revenue v. The Temperance Council of Christian Churches of England and Wales (136 L.T.Rep. 27). The Temperance Council of the Christian Churches of England and Wales was a body the purpose and object of which was 'to take united action to secure legislative and other temperance reforms'. From the wording of their objects and a consideration of their activities, it was clear that the first object of the Council was to obtain legislation for promoting temperance. The Council held cer-tain income-producing investments, and the Commissioners of Inland Revenue applied by case stated to determine whether the income of the Council was exempted from income tax on the ground that the interest and dividends formed part of the income of a body of persons established for charitable purposes and had been applied for charitable purposes only. Mr. Justice Rowlatt held the Council was constituted mainly with the direct purpose of effecting changes in the law. Whether these changes were wise or unwise; whether they were pursued on party lines or quite independent of political party he considered wholly immaterial. Such a purpose could not be called a charitable purpose. He could not, having regard to the facts, consider the promotion of temperance as the Council's primary object, and obtaining legislation as a subsidiary object so as to bring the case within the principle laid down in Re Scowcroft; Ormrod v. Wilkinson ((1898) 2 Ch. 638). He therefore held that the income of the Council was not exempted from tax.

"The decision of Mr. Justice Rowlatt in the Commissioners of Inland Revenue v. Temperance Council of England and Wales turned entirely on the legislative activities of the Council, and did not substantially touch the question whether, if the object of the Council had been the promotion of temperance reform alone, the income would have been the income of a charity and exempt from taxes." The Promotion of Temperance as a Charitable Purpose, 171 L.T. 222, 223.

It is true that in this country only the Judges of Massachusetts[20] have been persuaded by their English brethren. The cases are collected by Professor Scott in 3 Scott on Trusts, §§ 374.4, 374.5, 374.6, and in notes in the American Law Reports Annotated and in various law reviews.[21]

---

[18] "Athenian: The other story implied that wine was given man out of revenge, and in order to make him mad; but our present doctrine, on the contrary, is, that wine was given him as a balm, and in order to implant modesty in the soul, and health and strength in the body." Translation: 2 Jowett, The Dialogues of Plato, pp. 449, 450.

[19] 4 Halsbury's Laws of England, above cited, p. 137.

[20] In passing upon the trusts of the philanthropic Jackson family of Boston.

[21] Validity of charitable trust to promote change in laws or system or methods of government, 21 A.L.R. 951; Validity of testamentary trust to promote women's rights, 28 A.L.R. 720; Gift to prohibit or minimize manufacture, sale, or use of intoxicating liquor as a valid charitable trust, 73 A.L.R. 1361; Trusts—Charitable Use—Bequest to Procure Change in Existing Laws, 71 University of Pennsylvania Law Review 89 (note); Bartlett, Charitable Trusts to Effect Changes in the Law, 16 California Law Review 478; Linton Corporation Organized for Political Purposes As A Charitable Organization, 36 Michigan Law Review 139.

I believe the numerically inferior decisions to be logically superior and so prefer to follow England and Massachusetts.[22] The promulgation of causes in that group called the State[23] is usually in three stages. The particular cause may be studied, it may be advocated, or finally that advocacy may extend to a plenary form. The proponents of a "way of living" may so strongly believe in its wisdom and its righteousness that they wish to bind all dissidents. It is just at this point that the courts divide. The English judges give the simplest reason for their position. They emphasize an additional uncertainty. Ultimate benefit lies generally in the field of prophecy. It depends upon the merits of the cause itself. The relation between accomplishment and compulsion is even more problematical.

I suggest two, as I think, equally persuasive, if rather more subtle considerations. The courts have, as I said earlier, somewhat paraded their neutrality. A "big hearted" donor could espouse the queerest things and the fact that he or she[24] might be a minority of one made no difference. It is hardly consistent, then, to turn around and approve the compulsion of minorities. Some of it is essential to government. The minority in favor of murder must be restrained. Let the state establish its own policy on such matters without help from volunteers among the population. And furthermore, let those who compose the voice of the state, the members of its legislative body, do so without being subject to even permissible "lobbying". I say "permissible" because the courts have only objected to the secret influence type.[25] Undoubtedly, however, there is a faint odor of harm in the use of money to present only one side of any proposition. To paraphrase, it may place the Lord on the side of the heaviest money-bags.[26] Although, therefore, one may not object, he may assuredly refrain from encouraging—either by way of offering the state's help in enforcement or in subvention.

---

[22] "I shall enter on no encomium upon Massachusetts; she needs none. There she is. Behold her, and judge for yourselves." Webster, Second Speech on Foot's Resolution, January 26, 1830, p. 317.

[23] Fairchild, General Sociology, p. 21.

[24] "Joanna Southcote, a foolish and ignorant woman", Thornton v. Howe, (1862) 31 Beav. 14; cf. "Madam Blavatsky, the Foundress of the Theosophical Movement", Wills—Theosophical Society As A Charity—Cy Pres Doctrine, 17 Boston University Law Review 911, 912 (note).

[25] Commissioner of Internal Revenue v. Textile Mills Securities Corp., 3 Cir., 117 F.2d 62, 72.

[26] Voltaire, Letter to M. le Riche, February 6, 1770.