## LORD'S DAY ALLIANCE OF PENNSYLVANIA v. UNITED STATES.

### Civil Action No. 5085.

District Court, E. D. Pennsylvania.

March 25, 1946.

Ralph B. Umsted and Romain C. Hassrick, both of Philadelphia, Pa., for plaintiff.

C. Moxley Featherston, Sp. Asst. to Atty. Gen., and Thomas Curtin, Asst. U. S. Atty., of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This action was brought for the recovery of Social Security taxes, penalties, and interest, paid to the Collector of Internal Revenue for the First District of Pennsylvania on October 27, 1944. The total amount involved is $66.40 plus interest. On February 7, 1945, the plaintiff filed its claim for refund asserting that it was exempt from the tax, and on March 24, 1945, the Deputy Commissioner of Internal Revenue, by letter, notified the plaintiff of the disallowance of its claim.

The plaintiff bases its assertion of exemption on Sec. 811(b) (8) of the Social Security Act of 1935, 49 Stat. 639, 42 U.S. C.A. § 1011(b) (8),[1] which excludes from coverage, "Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable,

---

[1] Incorporated in the Internal Revenue Code, 53 Stat. 178, 26 U.S.C.A. Int.Rev.Code, § 1426(b) (8).

scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual." [2]

It is unquestioned that no part of the net earnings of the plaintiff inures to the benefit of any private shareholder or individual. The sole issue presented, therefore, is whether the plaintiff was organized and is operated exclusively for one or more of the purposes set forth in the quoted statute. Its contention is that it is exclusively a religious corporation.

The evidence discloses the following facts. Plaintiff, The Lord's Day Alliance of Pennsylvania, was incorporated under the laws of Pennsylvania on September 20, 1922. Its charter declares that it was incorporated "To educate the people of this commonwealth in the reverent observance of the Lord's Day, commonly called Sunday, and to use all lawful means to that end."

The Alliance is supported entirely by contributions from churches, church groups, church members, and other persons and organizations. All persons approving of its purpose and contributing annually are members. The Alliance does not seek to advance the principles of any particular religious denomination; it does not have a place of worship, nor attempt to prescribe any form of religious worship for its members, except the teaching of the Lord's Day as a sacred day, which is a part of the teaching of Christianity; evangelistic work is done only to that extent. It is approved by the Presbyterian and Baptist Churches, other church groups, and has the support and cooperation of the State Council of Churches, the recognized body of cooperative Protestant churches in Pennsylvania. Its body of directors and officers is preponderantly of the clergy.

The work of the Alliance is directed toward the preservation of the Christian Sabbath, Sunday. To this end, it encourages Sunday School superintendents to teach the children how to observe Sunday and encourages ministers to preach sermons on the subject, supplying them with information. The Field Secretary travels throughout the state all year round conferring with church groups, or other religious groups connected with churches, and talking on the subject of the Lord's Day before church congregations and other groups. Also, the Alliance has begun to issue a paper called the "Pennsylvania Sabbath," which is sent to a mailing list.

It is the government's contention that the Alliance is not a corporation organized and operated exclusively for religious purposes because it engages in certain activities political in character and purpose, which are sufficient to unclass it. The Alliance, it appears, as part of its program furthering the sacredness of the Lord's Day, assists and cooperates with the proper officials if asked, notifying them of violations of the Sabbath laws. Also, it opposes legislation that "lowers" the standard of the Christian Sabbath, such as bills legalizing ice shows, hockey, etc. on Sunday, and favors legislation which, directly or indirectly, strengthens the observance of Sunday as a holy day. The time of the Alliance spent on such legislative matters is limited to the time the Pennsylvania Legislature is in session, approximately four to five months in two years. The Alliance does not participate in any political campaigns, does not recommend or endorse candidates for office, nor contribute to the support of any candidate. However, it keeps a record of the voting on the bills in which it is interested, and furnishes the voting record of the legislators on a particular bill when asked. It also may write to various legislators expressing its views, and members of the Legislature are included in the mailing list of its paper. During the sessions of the Legislature, the General Secretary attends at Harrisburg one day a week, so that he has become personally acquainted with a large number of the legislators, to whom he turns for information. However, the General Secretary testified that such conduct was not for the purpose of applying pressure. Occasionally the Gen-

---

[2] By Sec. 606, Title VI of the Act of August 10, 1939, 53 Stat. 1381, 1384, Sec. 1426(b) (8) of the Internal Revenue Code was amended by adding the words, "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."

26 U.S.C.A. Int.Rev.Code, § 1426(b) (8). This amendment, however, is inapplicable to the instant case, since the taxes in controversy are for the period from January 1, 1937, through June 30, 1937, which is prior thereto.

eral Secretary appeared before committees, and requested a public hearing. No attempt is made to influence voters other than through the church, and the influence of the corporation is not asserted at the polls. Where referendums were held in municipalities with regard to the legalizing of entertainment on Sundays, the Field Secretary spoke to church congregations or other church groups if invited, or furnished information concerning bills or the law if asked.

It is my opinion that the instant case falls within the purview of the case of Girard Trust Co. v. Commissioner of Internal Revenue, 3 Cir., 1941, 122 F.2d 108, 138 A.L.R. 448, which was decided under a provision in the Estate Tax Law in substance identical to the section under which exemption is sought here.

In that case, a bequest was made to the Board of Temperance, Prohibition and Public Morals of the Methodist Church, a corporation organized "To promote the cause of temperance by every legitimate means; to prevent the improper use of drugs and narcotics; to render aid to such causes as in the judgment of the Board of Trustees, tend to advance the public welfare." Article IV of the Board's constitution made it the duty of the Board of Managers to represent the Church officially in every wise movement for the promotion of total abstinence and securing of legal prohibition of the liquor traffic; to devise such plans and make such advices as would "enable the Church most successfully to compass the overthrow of that great foe of society, the legalized liquor traffic." The Board of Tax Appeals, now the Tax Court, in 1940, 41 B.T.A. 157, found that the Board of Temperance engaged extensively in political activities and propaganda designed to influence legislation and participated in election campaigns as well. It determined that the Methodist Board was engaged to a substantial extent in the field of political advocacy, and that such activities, "plainly were not mediate or ancillary to the board's primary purpose; on the contrary, they constituted one of its primary and apparently most important purposes." Consequently, the Board of Tax Appeals held that the Methodist Board was not organized and operated *exclusively* for religious, charitable, or educational purposes, despite the fact that a large part of its activities were within the statute, and therefore, the bequest to the Methodist Board was taxable.

In reversing the decision of the Board of Tax Appeals, the Circuit Court of Appeals for the Third Circuit, in an opinion by Judge Goodrich, after determining that the Methodist Board was a religious organization, stated, at page 110, 122 F.2d:

"The difficult part of this case comes with regard to that part of the activity of the Board of Temperance which has to do with the attempt to influence legislation. A bright line between that which brings conviction to one person and its influence on the body politic cannot be drawn. * * * The step from acceptance by the believer to his seeking to influence others in the same direction is a perfectly natural one, and it is found in countless religious groups. The next step, equally natural, is to secure the sanction of organized society for or against certain outward practices thought to be essential. Thus we had Sunday observance laws long before prohibition of alcohol became an important issue. The advocacy of such regulation before party committees and legislative bodies is a part of the achievement of the desired result in a democracy. The safeguards against its undue extension lie in counter-pressures by groups who think differently and the constitutional protection, applied by courts, to check that which interferes with freedom of religion for any.

"Nor has the law sought to draw such a bright line between the exercise of private and public influence. Judge Hand has pointed out (in Slee v. Commissioner of Internal Revenue, 2 Cir., 1930, 42 F.2d 184, 72 A.L.R. 400) that the promoters of a charity are not unclassed when the charity seeks a special charter or when a society to prevent cruelty to children seeks positive support of law to accomplish its ends or when a university seeks legislation to provide its appropriations. *Surely a church would not lose its exemption as a religious institution if, pending a proposal to repeal Sunday observance laws, the congregation held a meeting on church property and authorized a committee to appear before a legislative body to protest against the repeal. * * *"* (Emphasis supplied.)

If there is a difference between the Girard Trust case and the case at bar, that difference lies in the emphasis accorded by the Court to the relation be-

tween the Board of Temperance and the Methodist Episcopal Church. As Judge Goodrich pointed out, not only was the Board of Temperance a part of the Church, but the advocacy of abstinence and the condemnation of the liquor traffic were part of the creed. Although the Lord's Day Alliance, here, was not similarly connected with any particular church, nevertheless it acted in cooperation with, and as the voice of numerous churches and church groups; its purpose, too, to advance the sanctity of the Sabbath Day, is part of the Christian doctrine.

It is exceedingly difficult to draw a sharp line in this case, between the religious and the political activities of the Alliance. Thus, a sermon on the holiness of the Sabbath Day may legitimately include an exhortation to the congregation or church group to observe and preserve the sanctity of the Sabbath. It would not be any less religious, or, for that matter, any more political, if the exhortation included expressions of approval of Sunday observance laws. Certainly if the minister may attempt to persuade his listeners to refrain from engaging in particular activities on Sunday, he would still be within the aura of religion if he denounced laws or proposed laws legalizing those activities on the Sabbath. And, in my opinion, the conclusion would not be different if the minister frequently included such material in his sermons, or if, as in this case, he, or the chairman of the church group, invited the Field Secretary of the Alliance to do the preaching. Similarly, if a referendum were to be held on a particular law, the religious aura is maintained if the sermon is delivered exhorting the congregation or group to preserve the sanctity of the holy day. Particularly important here is the fact that the Alliance participated in such activities by invitation, either to deliver the sermon or talk, or to give advice, as having greater knowledge of the subject matter.

Such activities as appearing before legislative committees are equally in consonance with the advancement of the Christian principle of the holiness of Sunday. Moreover, attending sessions of the Legislature to gain information concerning its acts and views is not political in nature. Likewise, it is a neutral fact that the Alliance furnished, upon request and without comment, the voting record of legislators on bills affecting Sunday observance. Furthermore, the Alliance did not participate in elections, endorse any candidate for office, or favor any political party.

However, the government contends that the Alliance is unclassed by the fact that at least a substantial part of its activities were "political" in nature. Although the applicable statute contains no such proviso, Article 12 of Treasury Regulations 91, states, in part, that "An organization formed or availed of, to disseminate controversial or partisan propaganda or which by any substantial part of its activities attempts to influence legislation is not an educational organization within the meaning of Section 811(b) (8) of the Act." The defendant further argues that the 1939 amendment to the Social Security Act [3] is merely a clarifying provision, interpretative of the earlier statute and intended to give legislative approval to a long continued administrative construction. [4]

 Without regard to the propriety of invoking the limitation suggested by the government, it is sufficient to say that I am of the opinion that the Alliance did not engage in political activities, the dissemination of partisan propaganda, or activities designed to influence legislation to a substantial extent. Such activities were minor, as compared to the over all functions of the Alliance. The legislative activities, for example, occurred only when the Legislature was in session, four or five months biennially. Moreover, I am of the

---

[3] See footnote 2. It may be noted that Section 402.215 of Treasury Regulations 106 (1940) amended Article 12 of Regulations 91 by adding to the above quotation the sentence, "However, the publication of books or the giving of lectures advocating a cause of a controversial nature shall not of itself be sufficient to deny an organization the exemption if carrying on propaganda, or otherwise attempting to influence legislation form no substantial part of its activities, its principal purpose and substantially all of its activities being clearly of a nonpartisan, noncontroversial and educational nature."

[4] This construction was adopted by the Board of Tax Appeals in the Girard Trust Case, 41 B.T.A. 157, 163, and the Board of Tax Appeals determined that the Board of temperance did in fact engage in political activities to a substantial extent.

opinion that the activities which the government contends unclass the plaintiff are incidental to the aims and objects of the organization, and did not, as in the case of Slee v. Commissioner of Internal Revenue, supra, constitute its primary purpose.

■ The fact that the Commissioner of Internal Revenue has denied income tax exemption [5] to the Alliance under a parallel provision of the income tax law,[6] but granted such exemption under a provision relating to civic organizations,[7] is not decisive. In the case of Better Business Bureau of Washington v. United States, 66 S.Ct. 112, this point was not raised, for it was admitted that the Bureau, insofar as its income tax status was concerned, fitted into the exemptive provision for business leagues and the like [8] rather than for educational organizations. However, the contention was that, for Social Security tax purposes, the exemptive provision in the Social Security Act relating to educational organizations, Section 811 (b) (8), should be construed broadly to include the Bureau. The Supreme Court determined, on the basis of legislative history, that that section of the Social Security Act was intended to be construed in the same way as its counterpart in the income tax law, Section 101(6), and that, since Congress had, by drafting two separate sections, drawn a line in the income tax law between organizations exclusively educational and business leagues and the like, the provision in the Social Security Act exempting educational organizations could not be construed to include those groups which fell into a different classification in the income tax law. It is important to note that the Supreme Court made a determination, on the facts, that the Bureau came within the one exemptive provision and not the other. Thus,

it found that the Bureau was essentially commercial in character, and that its activities were "directed fundamentally to ends other than that of education." In the instant case, as in the Girard Trust case, it is not questioned that if the Alliance stopped short of any possible attempt to influence or otherwise affect legislation, it would be entitled to the exemption sought: the Commissioner, in the letter refusing the taxpayer exemption, specifically based the denial upon the ground that it was engaged in a substantial measure in the dissemination of controversial propaganda and in attempts to influence legislation. Moreover, here, as also in the Girard Trust case, the activities of the Alliance fall within the type regarded as religious by long-standing Christian principle.

■ Granting that Congress did not intend Section 811(b) (8) of the Social Security Act to be more inclusive than Section 101(6) of the Internal Revenue Code, and recognizing that in the income tax law Congress drew a line between exclusively religious organizations on the one hand and civic organizations formed exclusively for promoting social welfare on the other hand: it seems to me that the plaintiff organization falls into the former "compartment" rather than the latter.[9] The Alliance was very plainly not organized to promote the social welfare, but rather to advance the religious observance of the Sabbath day, as a day sanctified in itself, and as a day of worship and church attendance.

Accordingly, on the basis of the pleadings, stipulation, and the testimony, I make the following

### Findings of Fact

1. The plaintiff, the Lord's Day Alliance of Pennsylvania, was incorporated

---

5 By letter dated August 12, 1944, the plaintiff was advised that, upon reconsideration of its status for income tax purposes, the plaintiff was not eligible for exemption under Section 101(6), relating to religious organizations, but was eligible for the exemption under Section 101(8), pertaining to "civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare."

6 Section 101(6), Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 101(6). This is similar to Section 811(b) (8) of the Social Security Act and Section 1426(b) (8)

of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 1426(b) (8).

7 The exemption granted by Section 101(8) of the income tax law has no counterpart in the Social Security tax law.

8 Section 101(7), Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 101(7). This also has no counterpart in the Social Security tax law.

9 Typical of the organizations which have secured exemption as civic leagues are the American Legion and the National Rifle Association of America. See 2 CCH Federal Tax Reporter, Par. 658 (1946).

under the laws of the State of Pennsylvania on September 20, 1922.

2. Plaintiff employed two persons from January 1, 1937, to December 31, 1937, and three persons from January 1, 1938, to September 25, 1942, the date of the filing of a petition for abatement of Social Security taxes, and has employed three persons from September 25, 1942 to the present time, these being the only employees of the said corporation.

3. Plaintiff is supported entirely by contributions from churches, church groups, church members and other persons and organizations.

4. Plaintiff filed a return, signed August 3, 1942, for taxes under Title VIII of the Social Security Act, 42 U.S.C.A. § 1001 et seq., for the period January 1, 1937 through June 30, 1937.

5. On October 27, 1944, the plaintiff paid to the Collector of Internal Revenue for the First District of Pennsylvania the sum of $66.40 as taxes, penalty, and interest, under Title VIII of the Social Security Act for the said period January 1, 1937, through June 30, 1937, the said sum being tax in the amount of $56.38, penalty in the amount of $7.20 and interest in the amount of $2.82.

6. On February 7, 1945, plaintiff filed a claim for refund of the said sum of $66.40, asserting that plaintiff was exempt from such tax on the ground that it was "strictly a religious organization".

7. On March 24, 1945, the Commissioner of Internal Revenue disallowed the plaintiff's claim for refund.

8. The plaintiff, Lord's Day Alliance of Pennsylvania, was not engaged to a substantial extent in carrying on propaganda or otherwise attempting to influence legislation.

9. The plaintiff is a religious organization engaged in promoting the reverent observance of the Lord's Day, commonly called Sunday, in cooperation with various churches and church groups in the Commonwealth of Pennsylvania.

I therefore state the following

## Conclusions of Law

1. Plaintiff, Lord's Day Alliance of Pennsylvania is entitled to exemption from taxes imposed by Title VIII of the Social Security Act of 1935 under Section 811(b) (8) thereof.

2. The plaintiff is entitled to recover taxes, penalty and interest paid under Title VIII of the Social Security Act for the period January 1, 1937, through June 30, 1937, in the amount of $66.40 together with lawful interest and costs.

An order may be entered in accordance herewith.