## INTERNATIONAL REFORM FEDERATION v. DISTRICT UNEMPLOYMENT COMPENSATION BOARD.

### No. 8064.

United States Court of Appeals for the District of Columbia.

Argued May 8, 1942.

Decided Sept. 21, 1942.

338

MILLER, Associate Justice, dissenting.

———◆———

Mr. R. H. McNeill, of Washington, D. C., for appellant.

Mr. Charles H. Burton, Counsel, District Unemployment Compensation Board, with whom Messrs. Richmond B. Keech, Corporation Counsel, D. C., Vernon E. West, Principal Assistant Corporation Counsel, D. C., and Boynton P. Livingston, Assistant Attorney, District Unemployment Compensation Board, all of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice and MILLER and VINSON, Associate Justices.

GRONER, C. J.

The District of Columbia Unemployment Compensation Act requires every employer who employs one or more individuals in any employment to pay into a fund to be administered under the provisions of the Act monthly contributions based upon percentages of the total wages payable to such persons. Section 1(b) (7) of the Act excepts: "service performed in the employ of a corporation, community chest, fund, or foundation, *organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes,* or for the prevention of cruelty to children

or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual."[1] (Italics supplied.)

The question in this case is whether appellant, the International Reform Federation, is an employer within the meaning of the Act and as such is required to make reports and unemployment contributions to the District Board in conformity therewith. The Board decided that it was. The District Court affirmed. The case is here on appeal.

The Federation has existed nearly half a century. The object of incorporation, as stated in its constitution, is "the promotion of those reforms on which the churches sociologically agree while theologically differing, such as the enactment and enforcement of laws prohibiting the alcoholic liquor traffic, the white slave traffic, harmful drugs and kindred evils in the United States and throughout the world; the defense of the Sabbath and purity; the suppression of gambling and political corruption; and the substitution of arbitration and conciliation for both industrial and international war". It boasts of having, at one time or another, written 36 bills on moral subjects for submission to various State legislatures, and 18 that have been passed by the Congress. Maintaining headquarters in Washington City, it has "expended much money in Asiatic countries in the suppression of the opium traffic" and has contributed "many thousands of dollars to scientific temperance education" and other like purposes. Its superintendent has authority to employ, when in his opinion such action is necessary, a law enforcement director to aid in "the enforcement of moral laws in the cities, counties, and states". Its literature department is made available to schools, libraries, and churches, and its official magazine is mailed to libraries, churches, ministers, moral leaders, and to members of the United States Congress and the State legislatures when moral issues are pending. Its funds are supplied by voluntary contributions from members in every State of the Union, from church budgets and voluntary offerings, and from a small endowment fund. It is admittedly a non-profit corporation, and no part of its earnings inures to the benefit of any private individual. It has no salaried personnel except its superintend-

[1] 49 Stat. 946, Sec. 311 (b) (7) T. 8, Supp. V, D.C.Code; 49 Stat. 1888, Sec. 311(b) (7), Supp. V, D.C.Code.

ent, its magazine editor, and a clerical staff of two persons.

Its superintendent, who is also its legislative director, testified that the work of the Federation consisted in part of the presentation of facts and arguments against immoral and illegal conditions found to exist in different parts of the United States; that its object and purpose is to co-operate with the religious, charitable, and educational organizations similarly engaged; and that it has from time to time devoted some of its income and some of the time of its employees to fighting for the prohibition of the alcoholic liquor traffic, to upholding the prohibition of the white slave and harmful drug traffics, and to the suppression of gambling and political corruption. The witness further testified that its activity in these latter respects is not its chief object, but is secondary and incidental and consumes very little of its time or effort in comparison to the time and effort consumed by other activities such as the dissemination of literature and pamphlets containing information, statistics, and other data on the subjects covered in its constitution.

The position of appellee, District of Columbia Unemployment Compensation Board, is that even if appellant should be classed as a corporation organized for charitable, religious, or educational purposes, which it says it should not be, it is nevertheless not organized nor operated *exclusively* for those purposes within the meaning of the exception clause in the Act. The basis of this contention is that the promotional and propaganda objects and activities of the Federation, as outlined above, place it outside the class of organizations intended to be exempt.

■■■ Counsel for the Board insist that, in order to be classified as a charitable corporation, it is necessary that appellant show that its principal objectives are to provide for the poor, the sick, and the needy, but we think this is too narrow and restricted a formula. In *Commissioner v. Pensel*,[2] Lord MacNaghten said that charity, in its legal sense, comprises four principal divisions—trusts for the relief of poverty; trusts for the advancement of education; trusts for the advancement of religion; and trusts for other purposes beneficial

to the community, not falling under any of the preceding heads. And we know of no modern case in which the definition has been confined strictly to the enumeration found in the Statute of Elizabeth. On the contrary, as the California Court said:[3] "* * * the differing condition, character, and wants of communities and nations, change and enlarge the scope of charity, and where new necessities are created new charitable uses must be established."

■■■ And, as Chief Justice Fitzgibbon in an Irish case said,[4] if the benefit is one which the founder believes to be of public advantage and his belief is rational and not contrary to the general law of the land or the principles of morality, the gift is charitable in the eyes of the law.

■■■ That Congress had in mind these broader definitions is confirmed by the words used in the Act, for by its terms it embraces religious, charitable, scientific, literary, or educational corporations, thus including within the exemption clause every nonprofit organization designed and operating for the benefit and enlightenment of the community, the State, or the Nation— in short, to apply the exemption to those organizations commonly designated charitable in the law of trusts. Consequently, we may properly draw analogy from the trust cases. In line with this, Pennsylvania upheld a charitable trust to promote improvements in the structure and methods of government with special reference to the initiative, referendum, and recall, and to ballot reform. Taylor v. Hoag, 273 Pa. 194, 197, 116 A. 826, 21 A.L.R. 946. Washington upheld one for the spread of the teaching of socialism. Peth v. Spear, 63 Wash. 291, 115 P. 164. New Jersey upheld one to distribute the works of Henry George in advocacy of the single tax principle. George v. Braddock, 45 N.J.Eq. 757, 18 A. 881, 6 L.R.A. 511, 14 Am.St.Rep. 754. Massachusetts sustained one for the preparation and circulation of books, newspapers, and the delivery of speeches and lectures to create public sentiment that would put an end to Negro slavery. Jackson v. Phillips, 14 Allen 539. Illinois upheld one to promote the attainment of women's suffrage. Garrison v. Little, 75 Ill.App. 402. And in Massachusetts, New York, Wisconsin, and Indiana, charitable trusts to

---

2 [1891] A.C. 531, 583.

3 Collier v. Lindley, 203 Cal. 641, 266 P. 526, 528.

4 In re Cranston, 1 Ir. 431, 446-7, cited in Scott on Trusts, vol. 3, Sec. 374.7.

reduce and abolish the use of intoxicating liquor have been held valid.[5] To the same effect is a recent English case. Re Joseph Hood, [1931] 1 Ch. 240.

In the view taken in the cases to which we have referred, it cannot be questioned that the general purposes as well as the activities of appellant, as we have outlined them above, may be said to be well within this rule. Unless, then, that portion of appellant's activities in relation to Federal and State legislation on subjects of moral or social interest unclass it as a charitable organization, the decision below must be reversed. The Board insists that appellant's activities are political and, being political, may not at the same time be charitable or educational in the sense in which those words are used in the Act. Undoubtedly some cases may be found sustaining the view that organizations seeking changes of law are engaged in political activity and therefore neither charitable nor educational, whatever the motive. The ground for such holdings is that the court has no means of judging whether a proposed change in the law will or will not be for the public benefit.[6] But this reasoning is not convincing, and we prefer the more modern view that so long as the purpose can be thought by some to be in the public interest, the court is not concerned with its wisdom. See Vol. 2, Bogert, Trusts and Trustees, § 378, at p. 1204.

Certainly no one will question that an educational campaign to arouse public sentiment against the commercial use of women in immorality, against the use of narcotic drugs, against gambling, and against political corruption, is in the public weal. Certainly most people believe that the habit of temperance in the use of intoxicating liquor is beneficial. · And certainly many believe that the absolute prohibition of the use of liquor will be helpful to man-kind. In the 50 years of its existence, appellant has pursued just these objectives, along with others which it believes to be for the public good and in the interest of public morals.

To this end it disseminates writings and sermons and expends its funds in educating the public mind to the nature and character of the evils it seeks to eradicate, and in doing so keeps in touch with, and on occasion prepares, bills, and appears before legislative committees, State and Federal, when these subjects are under consideration. It would seem to us to be going very far to say that these legislative activities accomplish a metamorphosis in appellant's character whereby it is changed from a charitable or educational to a political organization. Such activities have never been classified as lobbying in the sense in which that activity has been either prohibited or licensed. Hence we see no actual difference between the education of the individual—admittedly proper—and the education of the legislator, where both are directed to a common end, and that end, not the advancement, by political intrigue or otherwise, of the fortunes of a political party, but merely the accomplishment of national social improvement. There is nothing new in this position, and it has found support in many cases.[7]

In the recent case of Girard Trust Co. v. Commissioner of Internal Revenue, 122 F.2d 108, 138 A.L.R. 448, the Third Circuit Court of Appeals decided the identical question. The case involved the deduction for estate tax purposes of the amount of a bequest to the Board of Temperance, Prohibition, and Public Morals of the Methodist Episcopal Church. One of the stated objects of the Board was to promote temperance and suppress the liquor traffic through "the speedy enactment of such legislation throughout the world". It

[5] Bowditch v. Attorney General, 241 Mass. 168, 134 N.E. 796, 28 A.L.R. 713; Buell v. Gardner, 83 Misc. 513, 144 N.Y. S. 945; Harrington v. Pier, 105 Wis. 485, 82 N.W. 345, 50 L.R.A. 307, 76 Am. St.Rep. 924. Haines v. Allen, 78 Ind. 100, 41 Am.Rep. 555.

[6] 71 Pa.Law Rev. 89 (1922) and 36 Mich.Law Rev. 140 (1937-38).

[7] In Taylor v. Hoag, 273 Pa. 194, 197, 116 A. 826, 827, 21 A.L.R. 946, the Supreme Court of Pennsylvania said: "We are led to conclude that a trust for a public charity is not invalid merely be-cause it contemplates the procuring of such changes in existing laws as the donor deems beneficial to the people in general, or to a class for whose benefit the trust is created". To the same effect, see Bowditch v. Attorney General, 241 Mass. 168, 134 N.E. 796, 28 A.L.R. 713; Garrison v. Little, 75 Ill.App. 402; George v. Braddock, 45 N.J.Eq. 757, 18 A. 881, 6 L.R.A. 511, 14 Am.St.Rep. 754; Buell v. Gardner, 83 Misc. 513, 144 N.Y.S. 945; Re Foveaux, [1895] 2 Ch. 501; Armstrong v. Reeves, [1890] Ir.L.R., 25 Eq. 325; Farewell v. Farewell, [1892] 22 Ont.Rep. 573.

was urged there, as here, that this object of the Temperance Board invalidated its claim to exemption as a charitable, religious, or educational organization. In refuting this argument, Judge Goodrich says:

"Nor has the law sought to draw such a bright line between the exercise of private and public influence * * *. Surely a church would not lose its exemption as a religious institution if, pending a proposal to repeal Sunday observance laws, the congregation held a meeting on church property and authorized a committee to appear before a legislative body to protest against the repeal."

In the case now under consideration, as we have seen, the statute in precise terms excepts from its provisions service performed in the employ of a corporation operated exclusively for religious, charitable or educational purposes. Nothing is to be found in this paragraph which pronounces the corporation or the fund less charitable or less religious or less educational because it seeks to accomplish its purpose as well in the corridors of Congress as in the churches and homes of the people. Nor can such a distinction be implied with any degree of reason.

In the enactment of the unemployment law in the District of Columbia, it was within the discretion of Congress to include charitable or educational institutions on the same terms as business or social organizations or, if it excluded the former, to limit in such way as it thought proper the enjoyment of the preferred position. The language used by Congress evinces a clear purpose to exclude the former, but no purpose to limit their enjoyment of their preferred position. Had Congress intended such a limitation as is here contended for, it is fair to assume that it would have said so in precise terms. All that is requisite under the Act is that the institution shall be organized and operated exclusively for one of the named purposes. If this appears, the Act is inapplicable.

The conclusion we reach is strengthened by the fact that the words "corporations organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes" were thoroughly familiar to Congress, having been used in nearly all, if not all, of the revenue acts since 1913. In the Revenue Act of 1934, § 23(o) (2), 26 U.S.C.A.Int.Rev.Code § 23(o) (2), Congress definitely circum-scribed them by the addition of the phrase "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation". These supplementary words, if they show anything, show that Congress regarded the new phrase as necessary to avoid exemptions which might lawfully be claimed under the language of the original clause, and when it is remembered that in the present Act, passed just a year later, the same Congress used the original phrase without the addition, the natural and common sense view of the situation impels the conclusion that it did so deliberately and with the intention of distinguishing the rights under the two statutes.

The Board points to the case of Slee v. Commissioner of Internal Revenue, 2 Cir., 42 F.2d 184, 185, 72 A.L.R. 400, as reaching a different conclusion than that we announce, but we think this is not an accurate statement. That case involved the right to deduct from the federal income tax gifts to the American Birth Control League. Judge Hand, who wrote the opinion, reached the conclusion that the League was conducted in part for charitable purposes, in that it operated a free clinic, but that its avowed purpose to "enlist the support * * * of * * * legislators to effect the lawful repeal" of existing laws against birth control made that, rather than charity, its real objective. He distinguished the case from one in which a corporation, otherwise charitable, educational, or scientific, seeks legislation merely ancillary to the achievement of its main objective. He said:

"Nevertheless, there are many charitable, literary and scientific ventures that as an incident to their success require changes in the law. A charity may need a special charter allowing it to receive larger gifts than the general laws allow. It would be strained to say that for this reason it became less exclusively charitable, though much might have to be done to convince legislators. A society to prevent cruelty to children, or animals, needs the positive support of law to accomplish its ends. It must have power to coerce parents and owners, and it does not lose its character when it seeks to strengthen its arm. A state university is constantly trying to get appropriations from the Legislature; for all that, it seems to us still an exclusively educational institution. No less so if, for instance, in Tennessee it tries to get leave

to teach evolutionary biology. We should not think that a society of book lovers or scientists was less 'literary' or 'scientific,' if it took part in agitation to release the taboos upon works of dubious propriety, or to put scientific instruments upon the free lists. All such activities are mediate to the primary purpose, and would not, we should think, unclass the promoters."

So, in the instant case, the Federation's primary purpose is the establishment of higher codes of morality and manners throughout the world, and its contribution to or even its advocacy of legislation to these ends merely "mediate" or "ancillary" to the primary purpose.

■ In this view, we conclude that appellant is within the exception clause of the Act; that what are denominated its political activities do not make its purposes less charitable or educational; and that it was the intent and purpose of Congress, in enacting the clause in question without including the limitation which appears in the revenue laws, to make the exception apply where, as here, the primary and hence the exclusive purpose is religious, charitable, or educational.[8]

The judgment of the lower court is, therefore, reversed, and the cause remanded with instructions to proceed in accordance with the views expressed in this opinion.

Reversed and remanded.

MILLER, Associate Justice (dissenting).

I regret that I must dissent. In my opinion appellant comes clearly within the taxing provisions of the applicable statute and there is no reason why its employees should be deprived of the benefits of the District of Columbia Unemployment Compensation Act, which Congress intended they should enjoy. The District Court held, correctly in my opinion, that appellant's activities were not exclusively charitable, educational, or religious within the meaning of the exemption provisions of the statute;[1] hence that it was liable for the tax.

It is not clear from the majority opinion upon just which one of the seven possible grounds of exemption it is based. It concludes "that appellant is within the exception clause of the Act; that what are denominated its political activities do not make its purposes less charitable or educational; and that it was the intent and purpose of Congress, in enacting the clause in question without including the limitation which appears in the revenue laws, to make the exception apply where, as here, the primary and hence the exclusive purpose is religious, charitable, or educational." (Italics supplied.) Presumably the opinion proceeds upon the broad definitions of charitable purposes which are found in the trust cases; and which include religious, educational and many other purposes. This results in disregarding the fact, pointed out by the District Court, that the word charitable, as it appears in the statute, was used as designating a particular class in addition to other designated classes of charities, usually included in the larger meaning of the word. For the final, decisive step in its reasoning—that appellant's primary purpose is either religious, charitable, or educational, hence that its exclusive purpose is either religious, charitable, or educational—no authority is cited.

The fallacy which, it seems to me, underlies the majority opinion is the assumption that a complete and controlling analogy exists between the definitions of charitable purposes which are found in the trust cases and those which should be applied in the tax cases. But, in fact, there is no necessary identity between the indicia of a charitable trust and those of a charitable pur-

---

[8] Appellee cites Hazen v. National Rifle Association of America, 69 App.D.C. 339, 101 F.2d 432, 436, as sustaining its position. But that case is not in point for, in rejecting the contention of appellant there that it was exempt from the District of Columbia personal property tax because its property was used for educational purposes, we said that "it is the primary use made of the property which determines whether it is exempt" and "that at most the educational phase of appellee's activities is incidental and collateral to the social, recreative, promotional and propaganda phases which constitute its major reasons for existence". That condition does not obtain in the present case.

[1] D.C.Unemployment Compensation Act of August 28, 1935, as amended, D.C. Code (1940) § 46—301(b) (7): "service performed in the employ of a corporation * * * organized and operated exclusively for [1] religious, [2] charitable, ■ scientific, [4] literary, [5] or educational purposes, [6] or for the prevention of cruelty to children [7] or animals, * * *." (Numbers and italics supplied)

pose which will exempt an agency from taxation.[2] In the latter case the words *charitable purposes* are customarily held to a narrower meaning.[3] Gifts to charity are looked upon with such favor by the courts that every presumption consistent with the language used by the creator of the trust is indulged to sustain them.[4] But it does not follow that the gift will be exempt from taxation because of its charitable character.[5] The vital distinction between the trust cases and the tax cases, which, I think, destroys the reasoning of the majority opinion, is that the trust cases depend upon whether *a* charitable purpose can be found—whatever other purposes there may be—while the tax cases are based upon the requirement that the purpose must be *exclusively* charitable.[6] Hence, the analogy must fail, it would seem, at the very point of its application.

The majority opinion relies upon the recent case of Girard Trust Co. v. Commissioner;[7] but that case, carefully analyzed, fails, I think, to support its conclusion. Judge Goodrich was careful to base the decision of the court upon the religious character of the Methodist Church; the fact that the Board of Temperance, Prohibition and Public Morals of the Methodist Church stands in close relation to the General Conference of the Church, as do such other bodies as its Board of Foreign Missions, and operates under the Articles of Discipline of the General Conference of the Church; the action of the governing body of the Church in condemning the liquor traffic; the fact that the Church has since its organization in 1874, regarded personal practices of its members with regard to the use of intoxicating liquors as an inherent part of its religious practices. It was after laying this foundation for exemption, that the court went on to inquire whether the activity of the Board of Temperance, in attempting to influence certain legislation, would *unclass* an organization which was admittedly charitable, or educational, or religious in character. It was in this connection that it used the language quoted by the majority. The language omitted from the quotation is even more significant as indicating the reasoning of the third circuit court.[8] In the present case, the Reform Federation was not admittedly religious, educational, or charitable in character. Neither was it connected with such an institution, or governed by the governing board, or operated under the articles of discipline of such an institution. It must stand or fall by itself. The very question which must be determined is whether it—standing alone—is religious, or educational, or charitable in character.

It is in this respect, also, that the majority opinion, I think, misapplies Judge Learned Hand's opinion in Slee v. Commissioner.[9] In that case the American Birth Control League was, admittedly, a charitable institution; because it operated a free clinic, "a recognized form of charitable venture." But the important question was whether by agitating for the repeal of laws preventing birth control, the League was prevented from being *exclusively* charitable. The court said the effect

---

[2] 3 Scott, Trusts (1939) § 375.2: "It is to be constantly borne in mind that a decision that a trust or organization is not exempt from * * * taxes is not necessarily a decision that it is not charitable."

[3] Industrial Commission v. Woodlawn Cemetery Ass'n, 232 Wis. 527, 534, 287 N.W. 750, 753.

[4] Summers v. Chicago Title & Trust Co., 335 Ill. 564, 567, 167 N.E. 777, 778. See Franklin v. Hastings, 253 Ill. 46, 97 N.E. 265, Ann.Cas.1913A, 135.

[5] 3 Scott, Trusts (1939) § 374.4: "A decision to the effect that the donor or donee is not entitled to an exemption from the payment of a tax does not necessarily mean that the gift is not for other purposes a charitable gift."

[6] 3 Scott, Trusts (1939) § 374.4.

[7] 3 Cir., 122 F.2d 108, 109, 110, 138 A L.R. 448.

[8] Girard Trust Co. v. Commissioner, 3 Cir., 122 F.2d 108, 110, 138 A.L.R. 448: "Nor has the law sought to draw such a bright line between the exercise of private and public influence. *Judge Hand has pointed out that the promoters of charity are not unclassed when the charity seeks a special charter or when a society to prevent cruelty to children seeks positive support of law to accomplish its ends or when a university seeks legislation to provide its appropriations.* Surely a church would not lose its exemption as a religious institution if, pending a proposal to repeal Sunday observance laws, the congregation held a meeting on church property and authorized a committee to appear before a legislative body to protest against the repeal." (Italics supplied.)

[9] 2 Cir., 42 F.2d 184, 185, 72 A.L.R. 400.

of such agitation was to take the League out of the exempt class; in other words to unclass an otherwise admittedly charitable organization. It was in this connection that Judge Hand said: "Nevertheless, there are many charitable, literary and scientific ventures that *as an incident to their success* require changes in the law. A charity may need a special charter allowing it to receive larger gifts. * * * A society to prevent cruelty to children, or animals, needs the positive support of law to accomplish its ends. * * * A state university is constantly trying to get appropriations from the Legislature; for all that, it seems to us still an exclusively educational institution." (Italics supplied.)

In other words, assuming an institution which is, normally speaking, religious, or educational, or charitable in character, its attempt to secure a change in the law, as an incident of its success, is not enough to unclass it and deprive it of the exemption from taxation. Thus, in the present case, assuming that the Reform Federation was in fact a religious organization, the fact that it might have attempted to secure legislation to change its corporate character, or to enable it to invest its surplus in common stocks, or even to secure exemption of its property from taxation, would not have unclassed it and deprived it of a privilege based upon its religious character.

But when the attempt to secure legislation goes beyond such incidents of success, then it does unclass even an otherwise admittedly exempt organization. In the *Slee* case, the clinic which the League maintained was confined to married women "who ought not bear children both for their own, and the children's, sake." [10] The legislation for which it agitated was the repeal of laws preventing birth control. Certainly, this was getting pretty close to the work of the clinic; close enough, in fact, so that the court was impelled to comment: "We cannot say that the Board [of Tax Appeals] was without warrant in conclud-

ing that this aspect of the League's work was not confined solely to relieving its hospital work from legal obstacles." The decision of the court, accordingly, was that the exemption provision could not be availed of to defeat liability for the tax.

In the present case, the Reform Federation should fail on both counts. It is not, normally speaking, a religious, educational, or charitable organization, and the lobbying activities in which it engaged were far from being, merely, incidental to its success. In judging its character we should look to its own professions and activities.[11] It selected its own name and the words which it used to describe those activities.[12] It seeks now to use descriptive words of love, charity, religion, education. But the words which it chose for its name and for its constitution do not connote love or charity. Instead, they connote strife, conflict and bitterness. It cannot reasonably be doubted that appellant deliberately propelled itself into an area of politics, propaganda, law enforcement, campaigning for office, and legislative reform. However commendable such activities may be, they do not bring it within the exemption clause of the applicable statute.

Its name alone is significant of its character: *Reform* Federation. The word *reform* is broad enough to cover all human interests and activities. The cases in which it has been defined do not attempt to limit it, beyond such general specifications as the lessening of evil and the increasing of good;[13] to remove what is erroneous, superfluous, faulty; to supply deficiencies; a correction of faults or errors.[14] Webster defines *reform* as meaning: "Amendment of what is defective, vicious, corrupt, or depraved, or a case of it; reformation; a removal or correction of an abuse or wrong; as *reform* of elections; *reform* of government."[15] Certainly these are *not* the terms which are used to describe religion or education or charity. Certainly, they *are* the words

[10] 2 Cir., 42 F.2d 184, 185, 72 A.L.R. 400.

[11] Hazen v. National Rifle Ass'n, 69 App.D.C. 339, 101 F.2d 432.

[12] Cf. Pennsylvania Indemnity Fire Corp. v. Aldridge, 73 App.D.C. 161, 117 F.2d 774, 133 A.L.R. 914.

[13] Little v. State ex rel. Huey, 137 Ala. 659, 666, 35 So. 134, 136, *overruled on another point sub. nom.* State ex rel.

Gamble v. Hubbard, 148 Ala. 391, 41 So. 903. Cf. McCorquodale v. Texas, 211 U.S. 432, 435, 29 S.Ct. 146, 53 L.Ed. 269, citing Rapalje, Law Dict. 1083; McCorquodale v. State, 54 Tex.Cr. 344, 365, 98 S.W. 879, 887.

[14] In re Pennsylvania Tel. Co., 2 Chest. Co. Rep., Pa., 129, 131.

[15] Webster New International Dictionary (1931).

which are used to describe political activity.

In its constitution the Reform Federation did not pretend to define its activities in terms of particular purposes, educational, religious or charitable in character, or of charitable, religious or educational purposes generally. Consider its language: " * * * the *promotion* of those *reforms* on which the Churches *sociologically* agree while *theologically* differing, * * *." (Italics supplied.) Here seems to be an actual repudiation of religious purpose. It is difficult, indeed, to say in what respect, if at all, the churches *agree sociologically* upon anything. To many church people and to many sociologists religion and sociology are mutually exclusive.[16] Of one thing we may be sure; namely, that in using the word *sociologically* to describe its activities, the Reform Federation again gave itself the widest possible range. Webster defines *sociology* as follows: "The science of the constitution, phenomena and development of society. Both the term *sociology* and the science, in its modern acceptation, date from Comte's discrimination of it in 1838 as the science of the associated life of humanity. After Comte, Herbert Spencer was the chief founder of the science, *his application of the doctrine of evolution to social development* and this view of society as a 'social organism' contributing the main impetus and trend to its modern development."[17] (Italics supplied in part.)

Far from constituting an incident to an admittedly educational, religious or charitable purpose, the legislative activities of the Reform Federation were in themselves a major purpose. Far from limiting its activities to lobbying for certain specific legislation, the changes in the law which the Reform Federation sought, covered a wide variety of issues, several of which have been the subject of planks in party platforms and have been bitterly fought in local, state and national elections. In fact, the reforms for which it has sought legislative change would constitute a pretty formidable party platform in themselves: " * * * gambling, lotteries, red light abatement, the liquor and narcotic traffic, Sabbath observance, Bible in the public schools, marriage and divorce"; " * * * brutal sports, Sunday traffic, obscene prints, indecent shows and *all* promoted vices." (Italics supplied.) In its constitution it lists also "the substitution of arbitration and conciliation for both industrial and international war." One need be only a casual observer of the domestic and international scene to grasp the tremendous implications of this broad specification of purposes.

But the Reform Federation went far beyond the activities enumerated above. Its constitution provides that "there may be a legislative director who shall have charge under the direction of the General Superintendent, of securing the enactment of *good* Federal and state laws affecting mor-

---

[16] Consider, for example, the following quotations, the first by a well known sociologist, the second taken from The Catholic Encyclopedia.

a. Harry Elmer Barnes, *Sociology*, 13 Nelson's Encyclopedia (1940): "The sociological influence upon ethics has been revolutionary in theory, however little it may have effected conduct in practice. It has made clear the group basis of all ethical guides and criteria, however self-assured a social group may be with respect to the allegation of the divinely-revealed nature of its ethical concepts and practices. It has also emphasized the necessity of adopting a secular basis for the judgment of human conduct, insisting that the object of ethics should be to produce an ever greater number of happy and efficient human beings here upon the earth, and not to save a vast throng of souls eagerly quitting their earthly misery."

b. XIV The Catholic Encyclopedia (Spe-

cial ed. 1912) 117: "Modern sociology hopes to arrive at a metaphysics through the systematic observation and interpretation of present and past social facts and processes. In the Christian view of life, however, the social sciences are guided by a *sanctioned* metaphysics and philosophy. This philosophy is derived not from induction but from Revelation. This view of life accepts at the outset as divinely warranted the moral and social precepts taught or reenforced by Christ. * * * While modern sociology is seeking descriptive laws of human desires and is endeavoring to classify human interests and to account for social functions, *it is seeking merely for changes*, uniformities, and interpretations unconcerned with any relation of these to the Divine law." (Italics supplied.)

[17] Webster New International Dictionary (1931).

346

*als,* and shall *defeat* and *repeal bad* legislation." (Italics supplied.) In addition it had "a law enforcement director," it "maintained a department of law enforcement, chiefly engaged in the *suppression* of race-track gambling, purging the mails and newsstands of erotic literature and the *enforcement* of moral laws in the cities, counties and states * * *." (Italics supplied.) More than this it engaged in the conduct of campaigns "for the election of public officials, *whenever,* in *his* [law enforcement director] *judgment,* there is *a moral issue* at stake of sufficient consequence to justify participation of the Federation * * *." (Italics supplied.)

There is implicit in tax exemption theory that the agency exempted is, in each case, engaged in the performance of duties which, otherwise, the government would itself perform or which are of a nature which the government might properly perform; in other words, that by exempting from taxation, the government is in fact granting a subsidy to the agency in return for its relieving the government of a proper burden of government.[18] Surely no government, *in this country,* would or should engage in the activities which constitute the major part of the Reform Federation's work.

For all these reasons, and for what seem to me their obvious implications, in relation to the taxing functions of the District Government, I find it necessary, regretfully, to depart from the conclusions of my associates.

---

[18] Hazen v. National Rifle Ass'n, 69 App.D.C. 339, 343, 101 F.2d 432, 436, at n. 16, and cases there cited.