Alan B. Kuper and Virginia A. Kuper v. Commissioner.
Kuper v. Commissioner
Docket No. 199-62.
United States Tax Court
T.C. Memo 1963-239; 1963 Tax Ct. Memo LEXIS 105; 22 T.C.M. (CCH) 1208; T.C.M. (RIA) 63239; September 5, 1963
Martin D. Cohen, 744 Broad St., Newark, N.J., for the petitioners. Alvin C. Martin and Laurence Goldfein, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined a deficiency in *106 the petitioners' income tax for the year 1960 in the amount of $132.56. Two of the issues raised by the petition have been settled by stipulation. The only issue remaining for decision is whether the petitioners are entitled to a deduction under section 170 of the Internal Revenue Code of 1954 for a contribution of $100 made to the Millburn, New Jersey, League of Women Voters during the year 1960. Findings of Fact Some of the facts are stipulated and are found as stipulated. The petitioners are husband and wife residing at 86 Pine Street, Millburn, New Jersey. They timely filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue, Newark, New Jersey, on the cash basis of accounting. On December 27, 1960, petitioner Alan B. Kuper made a contribution of $100 to the Millburn League of Women Voters. Millburn is a municipality lying within Essex County, New Jersey. The Millburn League of Women Voters was organized in 1945, and from that time through the years involved here has been an unincorporated nonprofit organization operating under bylaws. Article II of these bylaws states the purpose and *107 policy of the Millburn League, as follows: Sec. 1. Purpose. The purpose of the League of Women Voters of Millburn shall be to promote political responsibility through informed and active participation of citizens in government. Sec. 2. Policy. The League of Women Voters of Millburn may take action on local governmental measures and policies in the public interest in conformity with the Principles of the League of Women Voters of the United States and the League of Women Voters of New Jersey. It shall not support or oppose any political party or candidate. During 1960 the membership of the Millburn League consisted of approximately 175 women who were citizens of the United States and residents of Millburn. The governing body of the Millburn League is a board of directors, each member of which is either an officer or a chairman of a standing committee. The Millburn League, for record keeping purposes, uses a fiscal year ended March 31. The Millburn League is basically an educational organization devoted to fostering an intelligent participation of women in public affairs at all levels of government. The League has studied various issues facing all levels of government. In *108 the area of local affairs the members conducted an extensive study of their town, which culminated in the publication in 1954 of a booklet entitled "Know Your Township." This booklet contained a discussion of the history of Millburn, its government and the services it provided, and various local facilities available for the use of residents. During the years involved here the Millburn League was engaged in a study of local schools which led to the publication in 1961 of a booklet entitled "Know Your Schools." This covered the organization, administration, finance, functioning and facilities of local schools. Finally, a complete study of the library facilities in Millburn was conducted by the League. The Millburn League held meetings monthly of groups of its members called units. At these meetings current local, State or national issues were studied. One member would be designated to prepare to lead the discussion of a particular issue. After the discussion, the members of the unit sometimes reached a conclusion with respect to the issue under consideration. In addition to studying political questions arising on the local, State or national level, the League endeavored to find the *109 manner in which governmental bodies operated. Thus, the members attended meetings of boards and committees of the Township of Millburn and occasionally attended sessions of the State legislature. One of the primary areas of activity of the Millburn League was in urging residents of Millburn to vote and informing them of the issues and positions of the candidates so they might vote intelligently. People were urged to vote, among other ways, through notices inserted in the local paper reminding them of an election. Issues were sometimes placed before the voters through League-sponsored meetings to which the public was invited and for which an attempt was made to obtain speakers to present all sides of a particular issue. Finally, candidates for election to various offices were asked their positions on pertinent issues. Frequently the candidates involved were requested to furnish, in writing, answers to the questions asked. The answers of all candidates who responded were published, candidates of all parties were treated equally, and the answers were published without editing. The Millburn League was an integral part of the New Jersey League of Women Voters. Article II of its bylaws *110 declares the purpose and policy of the New Jersey League of Women Voters are as follows: Section 1 - Purpose. The purpose of the League of Women Voters shall be to promote political responsibility through informed and active participation of citizens in government. Section 2 - Policy. The League of Women Voters of New Jersey may take action on state governmental measures and policies in the public interest in conformity with the Principles of the League of Women Voters of the United States. The League shall neither support nor oppose any political party or candidate. The New Jersey League acts primarily as a service organization for local leagues in New Jersey. In this regard, it prepares and provides to local leagues materials to be used in studying such questions arising at the State level as the local leagues of New Jersey choose to consider. It also provides organizational and administrative assistance to local leagues. The New Jersey League is financed by voluntary donations from its local leagues. The Millburn League donated to the New Jersey League $600 in 1960 and $625 in 1961. The Millburn League is also an integral part of the League of Women Voters of the United *111 States. The purpose and policy of the United States League are stated in Article II of its bylaws as follows: Sec. 1. Purpose. The purpose of the League of Women Voters of the United States shall be to promote political responsibility through informed and active participation of citizens in government. Sec. 2. Policy. The League may take action on governmental measures and policies in the public interest. It shall not support or oppose any political party or candidate. The League of Women Voters of the United States performs on the national level functions similar to those performed on the State level by the New Jersey League. Thus, it provides local leagues with materials for the study of national issues and gives organizational and administrative assistance to local units. The national League is financed by voluntary donations from the State Leagues. As an average, the New Jersey League sends approvimately 40 percent of the amount it receives from local units to the national League. Although the purpose of the League of Women Voters is not to accomplish particular legislative action, "It is," as the national League president testified, "to develop a well-rounded citizen, *112 a part of which would be taking legislative action." Therefore, the League, at the local, State and national levels, frequently arrives at positions on the issues it studies. These positions are generally arrived at in the Millburn League by obtaining a consensus of the views of the members. If the question is a State or national one, the consensus would be forwarded to the State or national League to be used in compiling a general consensus. The obtaining of a consensus of this kind was frequently the way that a position was arrived at on the local, State and national levels. The positions taken at all levels of the League were of two types. One of these, which was termed "Continuing Responsibilities," involved matters of a continuing nature upon which the League wished to maintain an enduring position. The other would relate to matters dealt with by the League on its current agenda. The type of issue involved in these matters would tend to be of a more ephemeral nature. After a position was taken, the League engaged in various activities in support of its position. If the position involved a national issue, representatives of the national League often testified before Congressional *113 committees urging the adoption of the League's views. Copies of this testimony were distributed to local leagues. The national office of the League would also follow the progress of various legislative items upon which the League had taken a position. Notices would be sent to the local leagues indicating the appropriate time for local leagues and their members to take action in support of the League's position. These notices were termed "calls to action." When "calls to action", were received by the Millburn League, notices would frequently be printed on the same subject and sent to all of the members. Individual members were urged to write the appropriate members of Congress or Government officials urging support of the League's positions. Members who responded to these "calls to action" acted in their individual capacities and not on behalf of the Millburn League. Thus, they were free to support or oppose the League's position. Upon receipt of one of the "calls to action" from the national League, the president of the Millburn League, or someone designated by her, frequently wrote members of Congress on behalf of the Millburn League. While the local leagues remained free to take *114 no action on matters adopted for action by the League on the national level, they could not act in opposition to the position taken by the national League. The Millburn League generally acted in support of the position of the national League. The State League of Women Voters would notify local leagues in New Jersey of the time to take action on matters on which the League had taken a position at the State level. These "calls to action" issued by the State League would take much the same form as those issued by the national League. The actions taken by the Millburn League upon receipt of "calls to action" from the State League were similar to those taken on receipt of a notice from the national League. The program of the League of Women Voters of the United States in April 1960, as listed in the May 1960 edition of its publication "The National Voter," was as follows: CURRENT AGENDA Governmental issues chosen by the Convention for concerted action. Support of U.S. economic policies which promote world development and maintain a sound U.S. economy. CONTINUING RESPONSIBILITIES Positions on national issues to which the League has given sustained attention and on which it *115 may continue to act. 1. Support of national policies and procedures which promote comprehensive long-range planning for conservation and development of water resources. Among these policies are: a) better coordination and elimination of conflicts in basic policy at the federal level; b) machinery appropriate to each region which provides coordinated planning and administration; c) cost sharing by government and private interests in relation to benefits received and ability to pay. 2. Support of the United Nations system, including adequate financial contributions, increased use, and improved procedures. 3. Modification of federal loyalty-security programs to limit scope, standardize procedures, apply "common-sense" judgment, and provide the greatest possible protection for the individual. 4. Self-government for the District of Columbia; extension of national suffrage to citizens of the District. 5. Measures granting the President authority to veto items in appropriation bills. 6. Opposition to constitutional limitation on tax rates. 7. Opposition to constitutional changes that would limit the existing powers of the Executive and the Congress over foreign relations. *116 The program of the New Jersey League was stated in the June 1959 edition of its publication "New Jersey Voter" as follows: STATE TAXES: Work for a graduated personal net income tax for New Jersey. 1. The main purpose is community education and legislative action. Kinds of action might include provision of speakers, panels or discussion leaders for other organizations, distribution of fliers prepared by the State or by the local League, formation of state and local citizens' committees and any other methods League ingenuity could devise. It will be important for each League to seize every opportunity not only to get across the advantages of the personal income tax but to refute arguments for the sales tax. To do this may mean that the pros and cons of the sales tax will have to be presented which is possible as long as the League's stand is clear. The explanation should be done as comprehensively as possible with the confidence that knowledge of all the facts will tend to lead others to favor the income tax, as it has us. Much will depend on the ingenuity and energy of the local Leagues. The State committee will make suggestions of various possible types of action, and may *117 provide materials and personnel for going to the community. 2. A secondary purpose is continued interest in state tax structure and revenue needs. This is in line with League wishes as revealed by the Convention and will contribute to League effectiveness in working for a personal income tax. (a) Be alert to study any proposed changes in New Jersey taxes. (b) Gather material on the experience of other states with the personal income tax to determine features which might be desirable for New Jersey. (c) Follow state budget making in the areas where revenue needs appear most significant. HIGHER EDUCATION: The role of government in furthering education beyond high school for all qualified students. In two years of study the League has analyzed New Jersey's existing facilities for higher education and the probable future demand for such education, and consensus was reached on the need to expand physical facilities. Action in accordance with this consensus will include support for the bond issue to be submitted to the people in November, 1959. The League will cooperate with the Citizens Committee for College Opportunities in New Jersey in organizing meetings, providing speakers, *118 distributing materials and other public information activities, to assure the approval of this referendum. Study under this item during the next two years will include analysis of such topics as: New Jersey's need for institutions for higher education, the role of the State University, the need for graduate and vocational facilities, admission requirements, the possible source of financial support for higher education, the procurement and retention of well qualified teachers, the administrative supervision of higher educational institutions, the role of the State Department of Education and a comparison with the pattern of higher education in other states. It is expected that a comprehensive kit will be prepared as soon as practicable. On the basis of this kit, units would be able to think through the future pattern of higher education in New Jersey with specific recommendations for action by state and local government. CONTINUING RESPONSIBILITIES: Consist of positions on state issues to which the League has given sustained attention and on which it may continue to take action. 1. Opposition to dedication of specific tax revenue for specific services. The League stands by our *119 present State Current Agenda item on taxes. 2. State financial measures to improve and equalize opportunities for education. 3. Measures leading to integration of public assistance at the county level. 4. Protection of Optional Municipal Charter Laws. 5. State executive departments headed by single administrators appointed by and responsible to the Governor. 6. Improvement of the procedures and facilities of the Legislature. 7. Revision of the State Election System: (a) A State Department of Elections headed by a single Commissioner appointed by the Governor. (b) A single Supervisor of Elections for each County replacing the present bipartisan Boards. (c) Revision of Title XIX to be prepared under the direction of the new State Commissioner, to be ready for submission to the Legislature by a specific date. (d) Statewide mandatory use of voting machines. (e) A residence requirement of 40 days in the county and 6 months in the state for voting in any election. 8. A long range state water resources plan which would include the acquisition of reservoir sites and the development of intra-state as well as inter-state rivers to insure an adequate supply for all water *120 needed. The Millburn League had little, if anything, of a legislative nature as a "Continuing Responsibility" on the local level during the years involved herein. It did, however, support higher salaries for teachers employed on the local level. During fiscal 1960 and 1961 the president of the Millburn League, on behalf of the League, wrote the following letters urging the League's position: 1. April 5, 1959, letter to George M. Wallhauser, Congressman, concerning requiring a loyalty oath of Federal employees. 2. May 5, 1959, four letters to delegates to the Republican and Democratic State conventions regarding the tax plank to be included in their platforms. 3. May 8, 1959, letter to Betty Kordja, chairman of the State Assembly Committee on Institutions, Public Health and Welfare, concerning the transfer of home relief assistance to the county welfare boards. 4. May 8, 1959, letter to Murray R. Klepesch on the same subject. 5. May 28, 1959, letter to George M. Wallhauser favoring home rule for the District of Columbia. 6. February 10, 1960, letter to Clifford P. Case, U.S. Senator, in support of increased appropriations for grants to States to build sewage treatment *121 works. 7. February 10, 1960, letter to Harrison A. Williams, Jr., U.S. Senator, on the same subject. 8. February 10, 1960, letter to George M. Wallhauser on the same subject. 9. February 24, 1960, telegram to George M. Wallhauser stating "Urge your vote to override president's veto on water pollution." 10. February 21, 1961, letter to J. W. Fulbright, U.S. Senator, urging support for U.S. membership in the Organization for Economic Cooperation and Development. 11. March 8, 1960, letters to Fox, Jones, D'Aloia and Brady, members of the New Jersey Legislature, urging an appropriation of $900,000 for college faculty salaries. 12. March 1, 1961, letter to Herbert H. Tate, member of the New Jersey Legislature, opposing the State tax program proposed by the Governor. 13. (Presumably approximately the same date) letter to Elmer M. Matthews, member of the New Jersey Legislature, on the same subject. It was at all times contemplated by the membership of the Millburn League during their study of any issue that if a position was taken with respect to that issue by any level of the League of Women Voters the Millburn League would support that position by attempting to influence *122 legislation wherever appropriate, unless an unusual situation occurred in which the Millburn membership felt it could not support a position of the State or national League. The respondent determined that a substantial part of the activities of the Millburn League of Women Voters was carrying on propaganda or otherwise attempting to influence legislation, and disallowed the petitioners' claimed deduction for the gift to the League. Although the Millburn League was basically an educational organization, a substantial part of its activities during the years involved was carrying on propaganda or otherwise attempting to influence legislation. Opinion The respondent contends that the petitioners are not entitled to a deduction under section 170 [1] of the Internal Revenue Code of 1954 for the gift of $100 to the Millburn League because a substantial part of the activities of the Millburn League involved propaganda or attempts to influence legislation. The petitioners, on the other hand, contend that the amount of activity of the Millburn League which was directed toward influencing legislation was inconsiderable. Each case of this type depends upon its own *123 evidence. See Henriette T. Noyes, 31 B.T.A. 121 (1934). It is undoubtedly true that the primary purpose of the Millburn League, as well as the State and national Leagues, was to stimulate interest in public affairs and educate its members in matters relevant to understanding various public issues. However, after considering all of the evidence, and in particular those facts set forth in our Findings of Fact, we have concluded that attempting to influence legislation did constitute a substantial part of the activities of the Millburn League of Women Voters during the years involved here. *124 It is noted that the petitioners filed their tax returns on the basis of a calendar year and the Millburn League used a fiscal year ended March 31, for accounting purposes. This difference might raise a question concerning the proper year to which we should look in determining whether the Millburn League met the qualifications set forth in section 170(c)(2) of the Internal Revenue Code of 1954. The parties have presented evidence of the operations of the Millburn League in both of the fiscal years which were in part within the calendar year 1960. We have not considered it necessary to determine the precise yearly period to which we should look because for purposes relevant here the operations of the Millburn League were substantially the same throughout the period beginning April 1, 1959, and ending March 31, 1961. The petitioners urge that none of the activities of the Millburn League can be considered as "propaganda, or otherwise attempting to influence legislation" within the meaning of the statute because the Millburn League desired to influence legislation not for its own selfish benefit but rather for the good of society as a whole. We do not think *125 that the language of the statute can be so narrowly construed. Even before the statutory language with which we are concerned was enacted in the Revenue Act of 1934, 48 Stat. 680, the Court of Appeals for the Second Circuit in dealing with a predecessor of section 170 of the Internal Revenue Code of 1954 stated: Political agitation as such is outside the statute, however innocent the aim, though it adds nothing to dub it "propaganda," a polemical word used to decry the publicity of the other side. Controversies of that sort must be conducted without public subvention; the Treasury stands aside from them. * * * Slee v. Commissioner, 42 F.2d 184 (C.A. 2, 1930), affirming 15 B.T.A. 710 (1929). We think that this language states the policy embodied in section 170(c)(2)(D) of the 1954 Code. Nor do we believe that the recent case of Dulles v. Johnson, 273 F. 2d 362 (C.A. 2, 1959), in any way affects the result here. There the Court of Appeals in finding that certain legislative activities of the organizations involved were not disqualifying stated: Moreover, the legislative recommendations of the Associations, insofar *126 as these recommendations do not involve matters the responsibility for which has been entrusted to the Associations by the Legislature, are designed to improve court procedure or to clarify some technical matter of substantive law. They are not intended for the economic aggrandizement of a particular group or to promote some larger principle of governmental policy. * * * The matters with which the Millburn League dealt were, during the years involved, in our view "larger [principles] of governmental policy." Thus, we hold that the petitioners are not entitled to a deduction for the $100 gift made in 1960 to the Millburn League of Women Voters. Decision will be entered under Rule 50. Footnotes
1. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (c) Charitable Contribution Defined. - For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of - * * *
(2) A corporation, trust, or community chest, fund, or foundation - (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation.↩